**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Gober Gudiel Sanchez-Garcia, )
          Petitioner, )
          )
vs. )
          )
United States of America, )
         Respondent. )
_____ )

No.   CV 24-607-TUC-CKJ
       CR 24-5833-TUC-LCK

**ORDER**

Petitioner Gober Gudiel Sanchez-Garcia ("Sanchez-Garcia") seeks a Writ of Error *Coram Nobis* (Doc. 1).  A response (Doc. 8), a reply (Doc. 11), and a Notice of Supplemental Authority (Doc. 13) have been filed.  Oral argument was presented to the Court on July 28, 2025.  Although counsel did not oppose the scheduling of an evidentiary hearing, neither counsel requested one.  As discussed herein, the Court finds the setting of an evidentiary is not required.  Further, for the reasons stated herein, the Court grants the Petition for Writ of Error *Coram Nobis* (Doc. 1).

Also pending before the Court are the government's Motion to Exceed the Page Limit in Government's Response to Petition for Writ of Error *Coram Nobis* (Doc. 9) and Sanchez-Garcia's Motion to Extend the Time to File Reply (Doc. 10).  The Court grants these requests.

I. *Factual and Procedural Background*

Sanchez-Garcia asserts he entered the United States from Guatemala seeking asylum in 2015.  Sanchez-Garcia was granted asylum and is currently a legal permanent

resident ("LPR").  His wife is a citizen of El Salvador who is currently in possession of a work visa.   Sanchez-Garcia has three U.S. citizen children and a Guatemalan citizen child from a previous relationship who resides in Guatemala.

Sanchez-Garcia states that, as an LPR, he is authorized to live and work in the United States, leave and reenter the United States at will, and eligible to sponsor his spouse and unmarried children under the age of 21 to become LPRs.  Not only does his visa allow him to reside in the United States in perpetuity, but in the absence of a violation of immigration or criminal laws, he has the opportunity to become a United States citizen after five years of having permanent resident status.  Sanchez-Garcia can, however, be deported if he commits certain offenses or engages in certain conduct; Sanchez-Garcia asserts he is not eligible for statutory immigration relief.

Sanchez-Garcia was arrested for bringing an undocumented alien into the United States by the U.S. Customs and Border Protection ("CBP") on August 21, 2024. 4:24-CR-05833-LCK Complaint (CR 24-5833, Doc. 1).  As summarized by Sanchez-Garcia:

> [Sanchez-Garcia] was the driver of a car with a passenger in the front seat. The passenger's name was Juan Carlos Rodriguez-Macias. [] According to the complaint, the CBP agent asked Mr. Sanchez-Garcia how they knew each other. Mr. Sanchez-Garcia replied that he didn't really know the passenger and had met him that day. [] He was doing a favor for his aunt. [] But Rodriguez-Macias, according to the complaint, was not authorized to come or be in the United States. Rodriguez-Macias told CBP that he did not know Mr. Sanchez-Garcia but told the officer that "he had paid him $2000 to use the identification to cross the border." [] Yet in a post-Miranda statement, Mr. Sanchez-Garcia never admitted to providing the passenger with an ID card or that he participated in the offense for money. [] He told CBP he went to Nogales, Mexico that morning to retrieve car titles.  There, he was told that Rodriguez-Macias would be joining him when he returned to the United States because he needed to hold the car titles. []

Petition, (Doc. 1, p. 4), *citing* Petition, Ex. A (CR 24-5833 Complaint (Doc. 1, pp. 1-2)).

On August 22, 2024, Immigration Customs Enforcement ("ICE") served Sanchez-Garcia with a Notice to Appear charging him with being "inadmissible" under Immigration and Nationality Act ("INA") § 212(a)(6)(E)(I), 8 U.S.C. § 1182(a)(6)(E)(i), which states, "[a]ny alien who at any time knowingly has encouraged, induced, assisted,

abetted, or aided any other alien to enter or to try to enter the United States in violation of law is inadmissible."  On August 23, 2024, after his release in CR 24-5833, ICE took Sanchez-Garcia into custody.  Pursuant to a writ of habeas corpus ad prosequendum in CR 24-5833, Sanchez-Garcia was returned to federal criminal custody.

On September 5, 2024, a federal information was filed in Tucson charging Sanchez-Garcia with the felony offense of alien smuggling for financial gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) (Count One), and a misdemeanor "bringing in" offense, in violation of 8 U.S.C. § 1324(a)(2)(A).  CR 24-5833 Information (CR 24-5833, Doc. 11).

Sanchez-Garcia asserts he did not have an in-person meeting with his defense attorney prior to his plea/sentencing.  They spoke once via video teleconference. Sanchez-Garcia asserts:

> [T]he lawyer did not give me good advice since every time I asked her what would happen if I pleaded guilty with my immigration case.  She always told me that everything would be fine since in 30 days I would be free.  When I arrived at immigration I found out from my lawyer Salvador Ongaro that I had to be expelled from the country because my defense lawyer did not want to take me to trial to prove my innocence of the crime for which I was convicted.  Since I greatly value my residence, which is to be with my wife and children, for that reason I wanted to go to trial to prove that I am innocent.

Petition, Ex. I[1] (Doc. 1-2, ECF pp. 40-41 of 58).

The defense attorney for Sanchez-Garcia in CR 24-5833 states:

> At the initial hearing I was informed that an immigration hold had been placed on Mr. Sanchez-Garcia.  I let him know that his arrest triggered a hold with ICE. At that specific hearing, I informed him that he was at risk for deportation once the case would be resolved.  He asked me to speak to his wife about his case and about

---

[1]Under 28 U.S.C. § 1746(2), an affidavit requirement may be met by signing, in the United States, with the following declaration: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct[,]" with the date of execution.  Although the Petition refers to Sanchez-Garcia's affidavit, the statement does not include this declaration. However, the government does not object to the reference to this document as an affidavit. Further, during argument the government stated it believes the document should be treated as if made under penalties of perjury, but does not believe the information contained therein is entirely accurate; government counsel also referred to the document as an affidavit.  The Court will accept the document as an affidavit.

the immigration issue that arose from his arrest.

• Met with Mr. Sanchez-Garcia on September 5th via VTC (unable to meet with him in person due to counsel testing positive for Covid)

• Reviewed both counts and maximum penalties, rights as a defendant, plea agreement, reviewed complaint and answered his questions

• Reviewed complaint and he did not dispute the facts of the complaint. In the complaint, Mr. Sanchez-Garcia coached the undocumented passenger what to say upon arrival at the port of entry and also stated that he was to be paid $2000 to transport this person into the United States.

• Informed Mr. Sanchez-Garcia that he did not need to accept the plea offer, that he could take his case to trial -that it would be the government who would move forward on the felony matter.

• After reviewing the facts of his case, Mr. Sanchez-Garcia informed counsel that he did not know the passenger in the vehicle, Mr. Sanchez-Garcia did not inquire whether or not the passenger had permission to cross into the United States legally; he did not dispute the fact of whether or not he instructed the passenger how to present himself at the border; he did not dispute the fact of getting paid $2000 to use the identification card at the border. All these facts work against Mr. Sanchez-Garcia if he wanted to go to trial.

• After reviewing the case-he informed counsel he wanted to plead guilty on the criminal case-he did not want to proceed with trial

• Counsel informed defendant( more than once) that pleading guilty and having this conviction may be used to deport or remove him from this country. He informed counsel he "just wants to move forward and deal with the immigration issue later"

• Once Mr. Sanchez-Garcia informed counsel he wanted to accept the plea agreement, counsel reviewed the plea agreement with Mr. Sanchez-Garcia. Counsel informed him that he would be pleading guilty to Count 2, Bringing an Illegal Alien to the United States without Authorization, a misdemeanor, and that the most serious offense, Count 1, Bringing an Illegal Alien to the United States for Profit, a felony, would be dismissed. I reviewed the elements of the offense and I reiterated paragraph 7 of the plea agreement that "the defendant recognizes that pleading guilty may have serious consequences with respect to his immigration status if defendant is not a citizen of the United States." Once again, I informed him about his immigration status. He verbally indicated he still wanted to accept the plea.

• Counsel spoke via text, phone calls and in-person with defendant's wife about the criminal [] case and also informed her and her step-father (in-person)about how this conviction would put him at risk for deportation. Counsel was informed that they (the family) have an immigration attorney and they have a lot of faith in him since he (immigration attorney) has assisted them in the past on obtained legal status.

Petition, Ex. J[2] (Doc. 1-2, ECF pp. 43-45 of 58).  Although texts between the wife of Sanchez-Garcia ("JG") and defense counsel indicate counsel agreed to speak with Sanchez-Garcia's immigration lawyer, defense counsel's statement does not include any reference to a conversation with the immigration attorney.

JG states:

> On Friday, August 23, 2024 I met the lawyer Marly Garcia who was handling the case of my husband Gover Gudiel Sanchez Garciia.  She asked me about my immigration status.  When I explained my immigration status to her, she told me not to do anything, that we no longer had a chance to help him, that I should leave him there or not come back.  I asked her if she should hire a criminal lawyer and she said no, because there was nothing else to do, that I should save that money and leave it there because he was a criminal who had to pay for his crime.
>
> In the last court hearing my husband had where he had to sign a document, she said that it was the best thing he could do to sign the agreement that the judge had given him that he would spend a month in jail and that after that month he would be released.  She never explained to us that this agreement would harm him more.
>
> I hired a private attorney to see if there was any further possibility of helping my husband.  The attorney tried to contact attorney Marly Garcia before the sentencing court to discuss the case and find a way to find a solution that would not further harm the case, but she did not answer the calls or contact the attorney.
>
> On the day of the court, the lawyer showed me the agreement that the judge gave to my husband and they were signed by the lawyer.

Petition, Ex. J[3] (Doc. 1-2, ECF pp. 46-47 of 58).  The text messages between JG and

---

[2]Under 28 U.S.C. § 1746(2), an affidavit requirement may be met by signing, in the United States, with the following declaration: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct[,]" with the date of execution.  Although the Petition refers to counsel's affidavit, the statement does not include this declaration.  However, the government does not object to the reference to this document as an affidavit and, indeed, also refers to this  document as an affidavit.  *See e.g.* Response (Doc. 8, p. 11).  The Court will accept the document as an affidavit.

[3]Under 28 U.S.C. § 1746(2), an affidavit requirement may be met by signing, in the United States, with the following declaration: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct[,]" with the date of execution.  Although the Petition refers to the affidavit of Sanchez-Garcia's wife, the statement does not include this declaration.  However, the government does not object to the reference to this document as an affidavit.  Further, during argument the government believes the document should be treated as if made under penalties of perjury, but does not believe the information contained therein is entirely accurate; government counsel also referred to the document as an affidavit.  The Court will accept the document as an affidavit.

defense counsel indicate JG informed counsel that an immigration attorney wished to speak to counsel before the hearing on Monday (apparently September 9, 2024). The translated text messages indicate "right now" would be a good time for the immigration attorney to call defense counsel. (*Id.* at ECF p. 58 of 58).

Sanchez-Garcia pleaded guilty to the Count II misdemeanor offense of the information pursuant to a written plea agreement on September 9, 2024. CR 24-5833 Plea Agreement (CR 24-5833, Docs. 14, 15). The plea agreement provided, *inter alia*:

> 7. The defendant recognizes that pleading guilty may have consequences with respect to his/her immigration status if defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offenses(s) to which defendant is pleading guilty. Removal and other immigration consequences may be the subject of a separate judicial or administrative proceeding, and the defendant has discussed the direct and collateral implications this plea agreement may have with his or her defense attorney. Defendant nevertheless affirms that he/she wants to plead guilty regardless of any immigration consequences that this plea may entail, even if the consequence is defendant's automatic removal from the United States.

> 8. Defendant waives: . . . (3) any right to collaterally attack defendant's conviction and sentence under 28 U.S.C. § 2255, or any other collateral attack. . . This waiver shall not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel or of "prosecutorial misconduct" (as that term is defined by Section II.B of Ariz. Ethics. Op. 15-01 (2015)).

> 9. <u>Factual Basis for Plea</u>:

> On or about August 21, 2024, in the District of Arizona, I, Gober Gudiel Sanchez-Garcia, did bring a certain illegal alien to the United States. I knew that the alien whom I was bringing did not have authorization to come to, enter, or reside in the United States. I knowingly assisted the alien with the intent to evade the immigration laws of the United States.

*Id.* at Doc. 15. Sanchez-Garcia was sentenced on the same date.

The transcript from the change of plea and sentencing proceedings indicates the court advised Sanchez-Garcia that, after he served his sentence, he "may be deported or removed. That deportation order would always be on your immigration record and always used against you in the future." Sept. 9, 2024 Transcript (CR24-5833, Doc. 21) ("TR") 5:10-13. The court further stated that she knew Sanchez-Garcia had given counsel permission to sign the written plea agreement for him, TR 5:14-17, and that once the plea agreement was accepted he could not withdraw from it, TR 5:19-20. The following

1    colloquy occurred:

2        THE COURT:  Sir, did you understand everything that I went through as far as the
         rights?
3
         SANCHEZ-GARCIA ("SG"):    Yes.
4
         THE COURT: Are you thinking clearly today?
5
         SG: Yes, your Honor.
6
         THE COURT: Have you had any difficulties or problems communicating with Ms.
7        Garcia in Spanish?

8        SG: No, your Honor.

9        THE COURT: And were you able to understand what she explained?

10       SG: Yes, your Honor.

11       THE COURT: Do you understand the rights that you are giving up, the charges,
         and the penalties?
12
         SG: Yes, your Honor.
13
         THE COURT: Do you understand the consequences of pleading guilty and the
14       terms of your written plea agreement?

15       SG: Yes, your Honor.

16       THE COURT: Did you give Ms. Garcia permission to sign the plea agreement for
         you?
17
         SG: Yes, your Honor.
18
         THE COURT: Are you pleading guilty voluntarily?
19
         SG: Yes, your Honor.
20
         THE COURT: My understanding is that on August 21st, 2024, near Nogales,
21       Arizona, you did bring in a certain illegal alien into the United States. Is that
         correct?
22
         SG: Yes, your Honor.
23
         THE COURT: And was at -- that at the DeConcini Port of Entry in Nogales?
24
         SG: Yes, your Honor.
25
         THE COURT: Were you the driver of a Honda Civic that had another male
26       passenger in the vehicle with you?

27       SG: Yes, your Honor.

28

THE COURT: Did you know that that passenger did not have authorization to come, to enter, or reside in the United States?

SG: Yes, your Honor.

THE COURT: And did you knowingly -- knowingly assist the alien with the intent to evade the immigration laws of the United States?

SG: Yes, your Honor.

THE COURT: How do you plead to bringing in an illegal alien into the United States without authorization? Guilty or not guilty?

SG: Guilty, your Honor.

THE COURT: Thank you, sir.

TR 7:24-9:18.  Sanchez-Garcia was sentenced to a 30 day term in the custody of the Bureau of Prisons.  CR 24-5833 Judgment (CR 24-5833 Doc. 17); TR 5:18.

The government states the material witness, i.e., the passenger, was removed to Mexico through Nogales the next day, on September 10, 2024, pursuant to court order.

Sanchez-Garcia did not appeal his conviction or file a habeas petition.  The Petition states that he is in DHS custody in Florence, Arizona. (Doc. 1, p. 2).  On December 18, 2024, Sanchez-Garcia filed a Petition for Writ of Error *Coram Nobis* (Doc. 1).  A response (Doc. 8) and a reply (Doc. 11) have been filed.

II.  *Waiver Stated in Plea Agreement*

Sanchez-Garcia's plea agreement included a waiver of "any right to collaterally attack [his] conviction and sentence under 28 U.S.C. § 2255, or any other collateral attack[.]" CR 24-5833 Plea Agreement (CR 24-5833, Doc. 15, p. 2).  "[A] petition for writ of error coram nobis is a collateral attack on a criminal conviction." *Telink, Inc. v. United States*, 24 F.3d 42, 45 (9th Cir. 1994).  However, the plea agreement also provides the waiver "shall not be construed to bar an otherwise-preserved claim of ineffective assistance of counsel or of "prosecutorial misconduct" (as that term is defined in Section II.B. of Ariz. Ethics Op. 15-01 (2015)).  Plea Agreement (CR 24-5833, Doc. 15, pp. 2-3).

While the plea agreement addresses the definition of "prosecutorial misconduct,"

- 8 -

it does not address a definition of "otherwise-preserved" or discuss how Sanchez-Garcia could otherwise-preserve a claim of ineffective assistance of counsel.  Without any such clarification, the Court finds Sanchez-Garcia has not waived the right to raise an ineffective assistance of counsel claim.

III.  *Writ of Coram Nobis*

District courts have the power to issue a writ of *coram nobis* under the All Writs Act., 28 U.S.C. § 1651; *United States v. Morgan*, 346 U.S. 502, 506–07 (1954). However, "the writ of error coram nobis is a highly unusual remedy, available only to correct grave injustices in a narrow range of cases where no more conventional remedy is applicable." *United States v. Riedl*, 496 F.3d 1003, 1006 (9th Cir. 2007).  Indeed,

> A writ of error coram nobis "affords a remedy to attack a conviction when the petitioner has served his sentence and is no longer in custody." [Citation omitted.] The writ aids "those suffering from the lingering collateral consequences of an unconstitutional or unlawful conviction based on errors of fact and egregious legal errors." [Citation omitted.]

*United States v. Kroytor*, 977 F.3d 957, 961 (9th Cir. 2020); *see also Telink, Inc. v. United States*, 24 F.3d 42, 45 (9th Cir. 1994).

The Ninth Circuit adopted the following framework for deciding when a writ should be issued:

> [A] petitioner must show the following to qualify for *coram nobis* relief: (1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.

*Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987).  "[W]hether a petitioner can *reasonably* raise a claim is determinative of whether delay is justified." *Kroytor*, 977 F.3d at 961.  Failure to meet any of these elements would be fatal to Sanchez-Gracia's request for relief. *Matus-Leva v. United States*, 287 F.3d 758, 760 (9th Cir. 2002).

The Court agrees with the parties that the first (more usual remedy is not available) and third (adverse consequences exist from the conviction sufficient to satisfy the case

or controversy requirement of Article III) requirements for *coram nobis* relief have been met in this case.  The Court will discuss whether valid reasons exist for not attacking the conviction earlier and whether the error is of the most fundamental character.

A.  *Whether Valid Reasons Exist for Not Attacking the Conviction Earlier*

"A coram nobis petition is not subject to a specific limitations period." *Kroytor*, 977 F.3d at 961.  "However, petitioners are entitled to this relief only if they can 'provide valid or sound reasons explaining why they did not attack their sentences or convictions earlier.'"  *Id.*, *quoting United States v. Kwan*, 407 F.3d 1005, 1015 (9th Cir. 2005), *abrogated by Padilla v. Kentucky*, 559 U.S. 356 (2010).  "[C]ourts have denied relief for unjustified delay where 'the petitioner has delayed for no reason whatsoever, where the respondent demonstrates prejudice, or where the petitioner appears to be abusing the writ.'"  *Id.*, *quoting Kwan*, 407 F.3d at 1013.  "[W]here petitioners reasonably could have asserted the basis for their coram nobis petition earlier, they have no valid justification for delaying pursuit of that claim."  *Id.*, *citing Riedl*, 496 F.3d at 1006 (9th Cir. 2007)).

The government argues Sanchez-Garcia's Petition is subject to a claim of laches. The Ninth Circuit has stated:

> Under the *Hirabayashi* framework, the burden of proof is on the petitioner to offer valid reasons for the delay. [*Hirabayashi*, 828 F.2d. at 604].  Under laches, on the other hand, "the government first must make a prima facie showing of prejudice . . . If the government meets that burden, the burden of production of evidence then shifts to the petitioners to show either that the government actually was not prejudiced or that the petitioner exercised reasonable diligence in filing the claim." *Telink*, 24 F.3d at 47; *see also Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir.2000) (laches requires "a defendant [to] prove both an unreasonable delay by the plaintiff and prejudice to itself").  It is also true that some of our decisions have cited laches in their discussions of coram nobis petitions' timeliness. *See, e.g., Kwan*, 407 F.3d at 1013–14; *Telink*, 24 F.3d at 45–48; *Hirabayashi*, 828 F.2d at 605.

*Riedl*, 496 F.3d at 1008.  The Ninth Circuit decisions considering laches in the context of *coram nobis* relief did so as a supplemental defense raised by the government, but did not purport "to overrule the *Hirabayashi* framework, which places the initial burden of justifying delay squarely on the petitioner[.]"  *Id.*

- 10 -

1    Sanchez-Garcia was released from federal custody on September 19, 2024, and

2    retained counsel approximately two months later, immediately upon discovering the only

3    way he could possibly have avoided deportation was to have gone to trial.    The

4    government points out, however, that Sanchez-Garcia recognizes the statute "does not

5    require a conviction for the noncitizen to be deported; it is the person's conduct, not the

6    conviction," Petition (Doc. 1, p. 11), and that proceeding to trial would not have

7    necessarily removed the risk of deportation.    Further, the government asserts defense

8    counsel repeatedly warned Sanchez-Garcia that "pleading guilty and having this

9    conviction may be used to deport or remove him from this country."  Petition, Ex. J (Doc.

10   1-2, ECF pp. 43-45 of 58).  The government states:

> Indeed, it strains credulity to think that the petitioner just woke up one day and was
> shocked to learn that he could be removed in the wake of his guilty plea,
> particularly on this record. It is far more likely that, having benefitted from his
> favorable plea agreement and 30-day sentence (including dismissal of the felony
> charge in Count One), and now that he is facing the prospect of removal in
> still-pending immigration proceedings, he is simply taking a whack at setting aside
> his conviction to try to help his cause in that forum.

15   Response (Doc. 8, p. 8).

16   Case law addressing the delay in seeking *coram nobis* relief generally involves

17   significantly longer delays than at issue in this case.  *See e.g., United States v. Harkonen*,

18   No. 08-CR-00164-RS-1, 2015 WL 4999698, at *6 (N.D. Cal. Aug. 21, 2015), *aff'd*, 705

19   F. App'x 606 (9th Cir. 2017) (one year after appellate affirmance of conviction); *Hanna*

20   *v. United States*, 559 F. App'x 75, 76 (2d Cir. 2014) (16 year delay);  *Pickett v. United*

21   *States*, No. 18-CV-02560 (LDH), 2018 WL 9990828, at *2 (E.D.N.Y. Nov. 1, 2018) (18

22   year delay); *Thomas v. United States*, No. CIV.A. RWT-10-2274, 2011 WL 1457917, at

23   *3 (D. Md. Apr. 15, 2011), *amended*, No. RWT 10CV2274, 2012 WL 37521 (D. Md. Jan.

24   6, 2012) (43 month delay); *Smith v. McGinnis*, 49 F. Supp. 2d 102, 104 (E.D.N.Y. 1999),

25   aff'd, 208 F.3d 13 (2d Cir. 2000) (290 day delay).

26   The limited case law on shorter delays is mixed.  For example, one district court

27   determined that a two month delay, following resolution of a 28 U.S.C. § 2255 petition,

28

was reasonable. *United States v. Jackson*, 371 F. Supp. 3d 257, 265 (E.D. Va. 2019). However, another district court determined a delay a little over two months was not reasonable. *United States v. Mei*, No. 20CR1412KAMRML, 2022 WL 2441229, at *3 (E.D.N.Y. July 5, 2022). Moreover, as pointed out by Sanchez-Garcia, the Second Circuit, in finding a petition timely, has stated:

> [I]t is improbable that Kovacs (or whatever attorney he consulted) would have promptly thought about *coram nobis*, which is as arcane as it is ancient. The writ is an "extraordinary remedy" available only in rare cases. [Citation omitted.] Further, the Government does not suggest any tactical reason Kovacs would have delayed pursuit of the writ until 2011 if he had learned of it earlier.

*Kovacs v. United States*, 744 F.3d 44, 54 (2d Cir. 2014). However, under Ninth Circuit case law, the delay is from when a petitioner "reasonably could have asserted the basis" for the *coram nobis* claim, not from when a petitioner learned of the specific method of presenting a claim. *Kroytor*, 977 F.3d at 961.

In *Hirabayashi*, the Ninth Circuit indicated that expectations of a "lay person" should be grounded in reality when it comes to that person's ability to swiftly discover new facts that might support a *coram nobis* petition. 828 F.2d 591 at 605. Further, *coram nobis* petitions are subject to a "flexible, equitable time limitation[.]" *Telink*, 24 F.3d at 47.

In a "lay person" reality, after release from BOP custody and entry into DHS custody, two months is not an unreasonable time to learn of a possible claim. Rather, within approximately two months of being taken into DHS custody, after Sanchez-Garcia spoke with his immigration attorney, Sanchez-Garcia hired counsel in this case; the Petition was filed approximately one month later.

The delay must also be considered in conjunction with any prejudice to the government. "In making a determination of prejudice, the effect of the delay on both the government's ability to respond to the petition and the government's ability to mount a retrial are relevant." *United States v. Sanchez-Ramirez*, No. CR06-425 MJP, 2020 WL 1550628, at *2 (W.D. Wash. Apr. 1, 2020), *aff'd*, 847 F. App'x 486 (9th Cir. 2021),

1   *quoting Telink*, 24 F.3d at 48.

2       The government asserts its material witness is no longer available for presentation

3   at trial because he was removed and deported to Mexico pursuant to court order the day

4   after Sanchez-Garcia's sentencing.  Sanchez-Garcia does not respond to this argument.

5   In considering whether the delay affected the government's ability to mount a retrial, the

6   Court recognizes the material witness was removed one day after sentencing.  Unless

7   Sanchez-Garcia had filed a petition for *coram nobis* relief within one day, the material

8   witness would not have been available for trial.  In other words, it is not the delay in

9   filing the petition that affected the government's ability to mount a trial, but the

10  completion of the plea and sentencing.   Indeed, the government states the material

11  witness "was released and removed as a direct result of the petitioner's guilty plea."

12  Response (Doc. 8, p. 9).  The delay between one day after sentencing to the date of the

13  filing of the petition does not appear to be deliberate to gain a tactical advantage, but a

14  reasonable period for a lay person to learn of and pursue a claim.  Considering a flexible,

15  equitable time limitation, the Court finds Sanchez-Garcia's two month delay in seeking

16  advice from counsel is not unreasonable and did not prejudice the government.

17

18  B.  *Whether the Error is of the Most Fundamental Character*

19      "Errors [are] of the most fundamental character [if they] rendered the proceeding

20  itself invalid."  *Hirabayashi*, 828 F.2d at 604.  A *coram nobis* petitioner may show

21  fundamental error by establishing that he received ineffective assistance of counsel.

22  *Kwan*, 407 F.3d at 1014.  In this case, Sanchez-Garcia asserts he received ineffective

23  assistance of counsel when defense counsel did not advise him the law was clear that he

24  was subject to mandatory removal. *See U.S. v. Rodriguez-Vega*, 797 F.3d 781 (9th Cir.

25  2015) (where the immigration statute or case law expressly identifies the offense as a

26  ground for removal, "the deportation consequence is truly clear").

27      While the Court recognizes the Ninth Circuit has stated, "if an error is not plain,

28

it cannot be of the most fundamental sort, either[,]" *Cervantes-Torres v. United States*, 141 F.4th 1101, 1106 (9th Cir. June 24, 2025) (discussing plain error in the context of a jury instruction), the Court cannot say the alleged error was not fundamental where Sanchez-Garcia, based on the advice given to him by defense counsel and statements made to him by defense counsel and the court, are alleged to be incomplete. Indeed, the *Kwan* court recognized ineffective assistance of counsel was fundamental error in a *coram nobis* petition. *See also Rocha v. United States*, 675 F. App'x 713, 714 (9th Cir. 2017) (*coram nobis* requirement that the error must be of the most fundamental character is "satisfied if [petitioner] received ineffective assistance of counsel.")

### 1. *Ineffective Assistance of Counsel Standard*

To determine if Sanchez-Garcia suffered ineffective assistance of counsel, the Court applies the standards established by *Strickland v. Washington*, 466 U.S. 668 (1984). The two-pronged test established by *Strickland* requires that the petitioner claiming ineffective assistance of counsel show that (1) his counsel's performance fell below an objective standard of reasonableness, *id*. at 688, and (2) that there exists "a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different, *id*. at 694.

Further, Sanchez-Garcia may challenge counsel's ineffectiveness as it relates to the voluntariness of a plea waiver. *See Washington v. Lampert*, 422 F.3d 864, 871 (9th Cir. 2005); *see also United States v. Jeronimo*, 398 F.3d 1149, 1156 n. 4 (9th Cir. 2005). The Ninth Circuit has stated that a "'decision to enter into a plea agreement cannot be knowing and voluntary when the plea agreement itself is the result of advice outside the range of competence[.]'" *United States v. Ruiz*, 241 F.3d 1157, 1165 (9th Cir. 2001), *reversed on other grounds, quoting DeRoo v. United States*, 223 F.3d 919, 923-24 (8th Cir. 2000).

"A claim of ineffective assistance used to attack the validity of a guilty plea may be sustained where the petitioner establishes that the ineffective performance 'affected

1  the outcome of the plea process . . . [such] that absent the erroneous advice, [he] would

2  have insisted on going to trial.'" *United States v. Baramdyka*, 95 F.3d 840, 844 (9th Cir.

3  1996), *quoting Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *Tollett  v. Henderson*, 411 U.S.

4  258, 267 (1973) ("When a criminal defendant has solemnly admitted in open court that

5  he is in fact guilty of the offense with which he is charged, he may not thereafter raise

6  independent claims relating to the deprivation of constitutional rights that occurred prior

7  to the entry of the guilty plea.  He may only attack the voluntary and intelligent character

8  of the guilty plea by showing that the advice he received from counsel was [deficient].");

9  *see also Lafler v. Cooper*, 566 U.S. 156, 163 (2012).

10  Where a claim involves alleged occurrences outside the record, a hearing is not

11  required if the allegations "viewed against the record, either fail to state a claim for relief

12  or are 'so palpably incredible or patently frivolous as to warrant summary dismissal.'"

13  *Marrow v. United States*, 772 F.2d 525, 526 (9th Cir.1985), *quoting United States v.*

14  *Schaflander*, 743 F.2d 714, 717 (9th Cir.1984); *see also United States v. Taylor*, 648 F.2d

15  565, 573 n.25 (9th Cir. 1981) ("Whether a hearing is required on a coram nobis motion

16  should be resolved in the same manner as habeas corpus petitions.").   Where the

17  allegations of a petitioner contradict statements made in court, credibility must be

18  assessed.  *Shah v. United States*, 878 F.2d 1156, 1159 (9th Cir. 1989).  An evidentiary

19  hearing is not required where the issue of credibility may be "conclusively decided on the

20  basis of documentary testimony and evidence in the record." *Watts v. United States*, 841

21  F.2d 275, 277 (9th Cir.1988).   Also, courts may expand the record with other

22  documentary evidence, use their own notes and recollections, and use common sense.

23  *Shah*, 878 F.2d at 1159*; see also United States v. Espinoza*, 866 F.2d 1067, 1070 (9th Cir.

24  1988).  The Court, therefore, properly considers not only the documents of record, but

25  also the affidavits submitted by Sanchez-Garcia.

26  . . . . .

27

28

2. *Assistance of Counsel*

Sanchez-Garcia asserts counsel was ineffective for failing to adequately advise him of the immigration consequence of entering a plea of guilty in his criminal case. *See Padilla v. Kentucky*, 559 U.S. at 366-68 (*Strickland* creates an affirmative duty to advise alien defendant about immigration consequences of pleading guilty).

The government argues defense counsel discussed the case and plea agreement with Sanchez-Garcia in detail, including the consequences of the guilty plea, and told him he was at risk of deportation. Indeed, the affidavit of defense counsel states that she repeatedly advised Sanchez-Garcia pleading guilty and the resulting conviction may be used to deport and remove him from the United States and may have serious consequences with respect to his immigration status. Further, Sanchez-Garcia informed her he just wanted to move forward and deal with the immigration issue later.

Additionally, the plea agreement stated that Sanchez-Garcia recognized "that pleading guilty may have consequences with respect to his[] immigration status[,]" the offense to which Sanchez-Garcia was pleading guilty to was a removable offense, and Sanchez-Garcia had discussed the direct and collateral implications the plea agreement may have with defense counsel. Plea Agreement (CR 24-5833, Doc. 15). The plea agreement also states Sanchez-Garcia "affirms that he[] wants to plead guilty regardless of any immigration consequences that this plea may entail, even if the consequence is defendant's automatic removal from the United States." *Id*.

Sanchez-Garcia asserts, however, that merely being advised he "may" be deported or that he was at risk for deportation did not adequately advise him of the mandatory immigration consequences of his plea. The Petition states:

"[W]hen the deportation consequence is truly clear, the duty to give correct advice is equally clear." *Padilla*, 559 F.3d at 369. Yet [defense counsel] advised him "more than once that pleading guilty and having this conviction *may* be used to deport or remove him from this country." (italics added) (Exh. J., Garcia Affd). He was under the impression that he could be removed. She used words as "risk" when she advised him that "he was at *risk* for deportation once the case would be resolved." *ibid* (emphasis added). But the statute was clear that there were no risks or may, only removal based on conduct. Moreover, at the initial appearance,

she told him his arrest "triggered a hold with ICE." *ibid*. But "triggering an immigration hold" is vastly different from "triggering mandatory deportation." She also made cryptic comments to him about his immigration status. In her affidavit, she wrote that after reviewing paragraph 7 of the plea agreement, she "informed [Mr. Sanchez-Garcia] about his immigration status." But Mr. Sanchez-Garcia was fully aware of his immigration status, namely, that he was a permanent resident of the United States, and he made it clear to her from the beginning of the case that it was important for him to keep his status.

Petition (Doc. 1, pp. 11-12).

Additionally, the documents before the Court indicate defense counsel advised Sanchez-Garcia that he was at risk for deportation; Sanchez-Garcia asked her to speak with his wife about the case and immigration issue. Further, although defense counsel states JG told her they had an immigration attorney, defense counsel does not state whether she spoke to the immigration attorney as the texts between her and JG imply. The government argues the affidavits of Sanchez-Garcia and JG include inaccurate information because they contradict counsel's affidavit. However, a plain reading of the affidavits do not reveal clear inconsistencies; rather, similar information is relayed with different verbiage, with each affiant setting forth what is apparently their best recollection of events/conversations. For example, the affidavits do not clearly specify all of the details regarding contact with an immigration attorney, but it is clear such an attorney had been discussed. Similarly, the language may vary, but it is clear counsel told Sanchez-Garcia he may be deported. Further, in instances where affiants provide additional information, other affidavits do not address or contradict such information. For example, while Sanchez-Garcia asserts counsel informed him he would be free in 30 days, this in substance would be consistent if counsel advised him the plea agreement provided for a 30 day sentence.

The parties agree defense counsel advised Sanchez-Garcia he may be deported or was at risk of being deported, but did not advise him that, under the statute, removal was presumptively mandatory. *See e.g. United States v. Bonilla*, 637 F.3d 980, 984 (9th Cir. 2011) ("A criminal defendant who faces almost certain deportation is entitled to know more than that it is possible that a guilty plea could lead to removal; he is entitled to know

that it is a virtual certainty."); *see also United States v. Ruiz*, 548 F. App'x 410, 412 (9th Cir. 2013) (in addressing a withdrawal of a plea, the court stated, "our interpretation of *Padilla* required that Ruiz be informed not that she might face deportation, but instead that her deportation was a virtual certainty").  Although the parties disagree as to Sanchez-Garcia's interest in his immigration status prior to the plea and sentencing, this does not affect the fact defense counsel did not advise Sanchez-Garcia that removal was "presumptively mandatory[.]"  *Padilla*, 559 U.S. at 369.  Significantly, however, the government argues Garcia-Sanchez's removal was not a "virtual certainty," i.e., "presumptively mandatory."

The government argues that a reasonable defense attorney would not have necessarily determined that removal was automatically mandatory.  Rather, as happened in this case, removal proceedings are ongoing and it is up to an immigration judge whether Sanchez-Garcia is removed.  Indeed, the government asserts the determination is based on the facts of the case and may not require removal.  The government points out if the conviction warranted an automatic removal, Sanchez-Garcia would have been removed immediately and not been afforded an immigration hearing.  Additionally, even if it was determined Sanchez-Garcia is removable, Sanchez-Garcia could seek a deferral of removal based on the Convection Against Torture ("CAT").

Sanchez-Garcia argues, however, that a misdemeanor alien smuggling offense is an aggravated felony pursuant to 8 U.S.C. § 1101(a)(43), *Biskupski v. U.S. Att'y Gen.*, 503 F.3d 274, 281 (3rd Cir. 2007); *see also Gonzalez v. United States*, 981 F.3d 845, 848 (11th Cir. 2020), and requires removal as discussed in *Padilla*.  The Ninth Circuit has discussed the definition of an aggravated felony as defined in § 1101(a)(43)(N), stating "Congress clearly expressed that, with one inapplicable exception, *all* offenses defined in 8 U.S.C. § 1324(a)(1)(A) . . . are aggravated felonies." *Perez Morales v. Sessions*, 750 F. App'x 554, 556 (9th Cir. 2018), *emphasis in original.*  Although the Ninth Circuit was not discussing § 1324(a)(2), it's conclusion as to Congress's intent as to § 1324(a)(1)(A),

1   is similar to the Third Circuit's conclusion as to 1324(a)(2).  *Biskupski*, 503 F.3d at 280

2   ("Congress plainly and unambiguously included the offenses described in 8 U.S.C. §

3   1324(a)(1)(A)  and  (2)  as  part  of  the  definition  of  "aggravated  felony"  in  §

4   1101(a)(43)(N)."); *see also United States v. Hernandez-Guerrero*, 633 F.3d 933, 936 (9th

5   Cir. 2011) (discussing whether a § 1324(a)(2) conviction is an aggravated felony for

6   sentencing purposes); *Bahena de Sotelo v. United States*, No. 12CR0061 JAH, 2014 WL

7   923790, at *5 (S.D. Cal. Mar. 10, 2014) (accepted without discussion that § 1324(a)(2)

8   "is a removable offense").

9          The *Padilla* Court discussed removable defenses:

10          Under contemporary law, if a noncitizen has committed a removable offense after
            the 1996 effective date of these amendments, his removal is practically inevitable
11          but for the possible exercise of limited remnants of equitable discretion vested in
            the Attorney General to cancel removal for noncitizens convicted of particular
12          classes of offenses.

13   *Padilla*, 559 U.S. at 363-64.  In other words, the Attorney General, via an immigration

14   judge, will determine whether removal is appropriate. Nonetheless, the Supreme Court

15   determined Padilla had not received effective assistance of counsel.

16          The removal statute at issue in *Padilla* provides:

17          "Any alien who at any time after admission has been convicted of a violation of (or
            a conspiracy or attempt to violate) any law or regulation of a State, the United
18          States or a foreign country relating to a controlled substance ..., other than a single
            offense involving possession for one's own use of 30 grams or less of marijuana,
19          is deportable.

20   8 U.S.C. § 1227(a)(2)(B)(I).  The removal statute at issue in this cases provides:

21          Any alien who (prior to the date of entry, at the time of any entry, or within 5 years
            of the date of any entry) knowingly has encouraged, induced, assisted, abetted, or
22          aided any other alien to enter or to try to enter the United States in violation of law
            is deportable.
23
24   8 U.S.C. § 1227(a)(6)(E)(I).  Both provisions set forth conduct that will result in an alien

     who "is deportable."  In other words, Padilla would have been subject to the same
25
     removal proceedings as Sanchez-Garcia, yet the Supreme Court determined his removal
26
     was presumptively mandatory.
27
            Further, although Sanchez-Garcia's current assertions appear to contradict his in-
28

- 19 -

1   court statement that he understood the consequences of his plea agreement, this

2   understanding was based on the failure of defense counsel to advise him of the virtual

3   certainty of removal. Similarly Sanchez-Garcia's affirmance in the plea agreement that

4   he wanted "to plead guilty regardless of any immigration consequences that [the] plea

5   may entail, even if the consequence is defendant's automatic removal from the United

6   States[,]" followed the incomplete advice from counsel.

7        While the Court agrees with the government that whether Sanchez-Garcia is

8   ultimately deported is subject to the immigration proceedings, the Court finds the

9   similarities between *Padilla* and this case are significant enough that it can be said that

10  Sanchez-Garcia, if his offense conduct is established, is "presumptively deportable" and

11  " virtually certain" to be removed. Moreover, that Sanchez-Garcia may theoretically

12  avoid or defer removal (e.g., pursuant to CAT) "does not alter [a] conclusion that on the

13  record before us her removal was virtually certain." *Rodriguez-Vega*, 797 F.3d at

14  786–87. Counsel, therefore, should have advised Sanchez-Garcia of that virtual certainty.

15        The Court finds there are no unresolved issues of credibility based on the

16  documentary testimony and evidence in the record regarding the issue of whether

17  Sanchez-Garcia received ineffective assistance of counsel and, therefore, an evidentiary

18  hearing is not required as to this issue. *Watts*, 841 F.2d at 277. The Court finds counsel's

19  failure to advise Sanchez-Garcia he was subject to presumptively mandatory removal was

20  "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S.

21  690; *see also Chaidez v. United States*, 568 U.S. 342, 357 (2013), *citations omitted* ("A

22  reasonably competent lawyer will tell a non-citizen client about a guilty plea's deportation

23  consequences because '[p]reserving the client's right to remain in the United States may

24  be more important to the client than any potential jail sentence.'").

25        However, because a petitioner "must affirmatively prove prejudice, any deficiency

26  that does not result in prejudice must necessarily fail." *Dickey v. Davis*, 231 F. Supp. 3d

27  634, 666 (E.D. Cal. 2017), *aff'd sub nom*. *Colin Dickey v. Ron Davis* (Oct. 29, 2019); *see*

28

1    *also Murtishaw v. Woodford*, 255 F.3d 926, 953 (9th Cir. 2001), *citing Strickland*, 466

2    U.S. at 697.

3

4        3. *Prejudice*

5        Sanchez-Garcia must allege counsel's purported ineffective "'performance affected

6    the outcome of the plea process . . . [such] that absent the erroneous advice, [he] would

7    have insisted on going to trial.'" *Baramdyka*, 95 F.3d at 844.  More specifically, in *Lee*,

8    the Supreme Court recognized "that there is more to consider than simply the likelihood

9    of success at trial.  The decision whether to plead guilty also involves assessing the

10   respective consequences of a conviction after trial and by plea." 582 U.S. at 367.  Indeed,

11   attempting to predict a trial outcome "is neither necessary nor appropriate where . . . the

12   error is one that is not alleged to be pertinent to a trial outcome, but is instead alleged to

13   have affected a defendant's understanding of the consequences of his guilty plea." *Id*. at

14   368.[4]

15       In this case, the passenger told a CBP officer that he did not know Sanchez-Garcia,

16   but had paid him $2000 to use identification to cross the border and advised him how to

17   present himself and answer questions at the border. CR 24-5833 Complaint (CR 24-5833,

18   Doc. 1, p. 1).  Further, Sanchez-Garcia admitted in a post-*Miranda* statement that he had

19   provided a false statement to the inspecting officer.  Sanchez-Garcia asserts, however,

20   that he would have been able to present defenses (e.g., mere presence, lack of

21   knowledge).  Nonetheless, the Court finds it does not appear Sanchez-Garcia would have

22   been likely to prevail at trial.

23   _____

24       [4]*See e.g., United States v. Rodriguez*, 49 F.4th 1205, 1214 (9th Cir. 2022), *citation

25   omitted* (generally, in determining whether a defendant would have gone to trial, court
     assesses "(1) how likely the defendant would be to prevail at trial; (2) the defendant's relative

26   connections to the United States and to his country of citizenship; (3) the relative
     consequences of the defendant's guilty plea compared to a guilty verdict at trial; and most

27   importantly, (4) any evidence of how important immigration consequences were to the

28   defendant at the time he pleaded guilty.")

1    However, the Court considers whether the virtual certainty of removal supports
2    Sanchez-Garcia's assertion he would have proceeded to trial if he had received accurate
3    advice regarding deportation.   Sanchez-Garcia entered the United States in 2015; the
4    government paroled Sanchez-Garcia when he about 21 years of age into the United States
5    to apply for asylum from his home country of Guatemala and later granted his application
6    for asylum.   Sanchez-Garcia is married to an El Salvadorian citizen who has a work visa
7    and has children who are citizens of the United States; further, he maintains regular
8    contact with his mother who is a LPG.   Sanchez-Garcia has not traveled back to
9    Guatemala since his entry in the United States.   Additionally, Sanchez-Garcia was
10   employed at a warehouse for the year before his arrest and also worked in the gig
11   economy; he worked other positions prior to the warehouse position.  Sanchez-Garcia was
12   on a path to become a United States citizen in approximately three years.

13   Sanchez-Garcia has a Guatemalan citizen child in Guatemala.   He does not
14   maintain contact with this child.  Sanchez-Garcia's connections to the United States are
15   significant relative to his connections to Guatemala.   These ties to Guatemala are not as
16   significant as Sanchez-Garcia's ties to the United States.  *See e.g. Ruiz*, 548 F. App'x at
17   411–12 (in addressing withdrawal of a plea, court stated defendant "has longstanding ties
18   to the United States, having arrived here at the age of seven, having lived here for 30
19   years and having two U.S.-born children. She plausibly contends that, if she had known
20   the full extent of the immigration consequences of pleading guilty, she would have
21   attempted to negotiate a different plea that would not have mandated deportation.")

22   A conviction in the criminal case, whether by trial or plea, results in presumptive
23   removal.   In effect, the facts supporting removal are established by either method of
24   conviction.  However, should a trial not result in a guilty verdict, the government would
25   need to establish the facts supporting removal without the conviction.   This would
26   support a decision by Sanchez-Garcia to "throw[] a 'Hail Mary' at trial." *Lee*, 582 U.S.
27   at 358; *see also Rodriguez-Vega*, 797 F.3d at 789 ("It is often reasonable for a non-citizen

28

facing nearly automatic removal to turn down a plea and go to trial risking a longer prison term, rather than to plead guilty to an offense rendering her removal virtually certain.").

The evidence of how important immigration consequences were to Sanchez-Garcia at the time he pleaded guilty is mixed.  When advised by defense counsel he was at risk for deportation, Sanchez-Garcia asked her to speak to his wife about not only the criminal case, but also the immigration issue.  Further, Sanchez-Garcia states in his affidavit that defense counsel consistently told him everything would be fine because he would be free in 30 days.  Sanchez-Garcia states he "greatly value[s his] residence, which is to be with my wife and children, for that reason I wanted to go to trial to prove that I am innocent." Petition, Ex. I (Doc. 1-2, ECF pp. 40-41 of 58).

Additionally, JG states in her affidavit that defense counsel advised her they did not have a chance to help Sanchez-Garcia and that she should save her money and not hire an additional attorney.  JG states defense counsel said Sanchez-Garcia signing the agreement was the best thing for him, because he would be free after a month; defense counsel did not explain that the agreement would actually harm him. JG hired a private attorney; it appears this is the attorney who sought to speak with defense counsel prior to the plea/sentencing proceeding, as indicated in the text messages.

Further, although the record includes many references to Sanchez-Garcia being advised he "may" be deported and that he understood the consequences of his plea, there is no evidence in the record Sanchez-Garcia was advised and understood the consequence of presumptive deportation.

The affidavit of defense counsel indicates Sanchez-Garcia repeatedly stated he wished to plea guilty; further, he stated he wanted to address the immigration issue later. However, the inference of this evidence is unclear.  This evidence may be viewed as contradicting the evidence that the immigration issue was of great importance to Sanchez-Garcia.  However, it may also be viewed as Sanchez-Garcia accepted defense counsel's advice that removal was simply a possibility and, therefore, Sanchez-Garcia could focus

on the immigration issue after completion of the criminal proceeding and his expected release in 30 days; i.e., there was no reason for Sanchez-Garcia to worry about the immigration issue at that time.   The Court finds as significant that immigration consequences were repeatedly discussed between Sanchez-Garcia and his attorney, demonstrating Sanchez-Garcia's interest in his deportation consequences.

The Court finds there are no unresolved issues of credibility based on the documentary testimony and evidence in the record regarding the issue of whether Sanchez-Garcia would have rejected the plea agreement and proceeded to trial if he had received complete advice regarding the immigration consequences of a guilty plea. Therefore, an evidentiary hearing is not required as to this issue. *Watts*, 841 F.2d at 277. The Court finds Sanchez-Garcia was prejudiced by counsel's failure to advise Sanchez-Garcia he was subject to presumptively mandatory removal.   Further, the Court finds the error is of a fundamental character.   As such, Sanchez-Garcia is entitled to relief.

Accordingly, IT IS ORDERED:

1. The Motion to Exceed the Page Limit in Government's Response to Petition for Writ of Error Coram Nobis (Doc. 9) is GRANTED.

2. The Motion to Extend the Time to File Reply (Doc. 10) is GRANTED.

3. The Petition for Writ of Error *Coram Nobis* is GRANTED.   The plea of guilty, conviction, sentence, and judgment of Gober Gudiel Sanchez-Garcia in CR 24-5833-TUC-LCK as to the charge of Bringing in Illegal Aliens Without Authorization, 8 U.S.C. § 1324(a)(2)(A), are VACATED.

. . . . .

. . . . .

. . . . .

. . . . .

1      4.  The parties may file a request as to any other matters on which an order is

2    required, with the submission of any proposed order emailed to the chambers of the Court

3    (jorgenson_chambers@azd.uscourts.gov).

4      5.  The Clerk of Court shall also docket this Order in CR 24-5833-TUC-LCK.

5    DATED this 26th day of August, 2025.

6

7

8             Cindy K. Jorgenson
         United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28